## UNITED STATES DISTRICT COURT
## IN THE NORTHERN DISTRICT OF WEST VIRGINIA

**GREGORY W. BEE**,

      Plaintiff,

ELECTRONICALLY FILED
Aug 28 2020
U.S. DISTRICT COURT
Northern District of WV

Case No.: 1:20-cv- 215
Judge _____ Keeley _____

**SECRETARY ROBERT L. WILKIE**, in his capacity as Secretary of the U.S. Department of Veterans Affairs, and **U.S. DEPARTMENT OF VETERANS AFFAIRS**,

      Defendants.

### COMPLAINT

Now comes Plaintiff, Gregory W. Bee, by counsel, and for his Complaint against Defendant Secretary Robert L. Wilkie, in his capacity as Secretary of the U.S. Department of Veterans Affairs ("VA"), and Defendant U.S. Department of Veterans Affairs and states as follows:

**Parties, Jurisdiction & Venue**:

1.      At all times mentioned herein, Plaintiff was and is a resident of the Northern District of West Virginia and worked for the VA in the Northern District of West Virginia.

2.      At all times mentioned herein, Defendant Secretary Robert L. Wilkie was and is the head of the U.S. Department of Veterans Affairs.

3.      At all times mentioned herein, Defendant U.S. Department of Veterans Affairs operated the Louis A. Johnson VA Medical Center in Clarksburg, West Virginia.

4.      Plaintiff exhausted his administrative remedies by filing, *pro se*, internal complaints with (a) the VA's Office of Accountability and Whistleblower Protection ("OAWP"), beginning on February 21, 2019[1] and (b) an Equal Employment Opportunity ("EEO") complaint on July 5, 2019, which was investigated by the agency's Office of Resolution Management ("ORM") and forwarded to the VA's Office of Employment Discrimination Complainant Adjudication ("OEDCA") on January 3, 2020.  (2-10-20 OEDCA FAD at p. 1).

5.      After months of delay, the original OAWP complaint remains pending.

6.      The OEDCA EEO complaint resulted in a Final Agency Decision ("FAD") on February 10, 2020, which was appealed, *pro se*, to the EEOC's Office of Federal Operations on or about February 15, 2020.  The OEDCA's FAD focused solely on the disability discrimination allegations and refused to address the whistleblower allegations.  (4-8-20 VA App. Resp. to OEDCA FAD at p. 1, n. 2; p. 9, n. 15).  The appeal remains pending before the EEOC's Office of Federal Operations.

7.      Given that more than 120 and, for that matter, 180 days have passed since the filing of the EEOC appeal, Plaintiff is now permitted to bring all of his claims in this District Court.  *See* 5 U.S.C. § 7702; *see also* 2-10-20 FAD at p. 15.

8.      In addition to the discrimination theories, this District Court possesses jurisdiction over the whistleblower theories in this mixed case as well inasmuch as the agency failed to meet the time limit prescribed in 5 U.S.C. § 7702.  *See, e.g., Bonds v. Leavitt*, 629 F.3d 369, 379 (4th

---

[1] Later, Plaintiff filed a second OAWP complaint (Clarksburg-WV-13,823).  This additional OAWP case (Clarksburg-WV-13,823), filed October 25, 2019, is separate and distinct from the original one filed in February 2019 that is still currently pending  In any event, on August 5, 2020, the OAWP emailed Plaintiff and advised that his request for re-review of the second OAWP case (Clarksburg-WV-13,823) had been denied.

Cir. 2011); *Ikossi v. Dep't of Navy*, 516 F.3d 1037, 1041-44 (D.C. Cir. 2008); *Seay v. TVA*, 339

F.3d 454, 471-72 (6th Cir. 2003); *Doyal v. Marsh*, 777 F.2d 1526, 1533, 1535-37 & N. 5 (11th

Cir. 1985); *see also Perry v. MSPB*, 137 S.Ct. 1975 (2017).

**Facts**:

9.     Plaintiff is an Army veteran, who served abroad and worked in support of

Operating Enduring Freedom in Afghanistan, and he has suffered and continues to suffer from

PTSD and related anxiety and depression.

10.     In 2015, Plaintiff began working as a Timekeeper in the Patient Care Services

Department at the Louis A. Johnson VA Medical Center in Clarksburg.

11.     Between 2015 and 2017, Plaintiff received favorable employment evaluations and

performed his job admirably.  In his 2017 performance evaluation, Plaintiff was praised for,

among other things, taking on the responsibility of maintaining the Standard Operating

Procedures (SOPs) for the Clarksburg VA.

In *early 2018*, Plaintiff established he would not kowtow to the Clarksburg VA's unreasonable
demands.

12.     In the beginning of 2018, Plaintiff and nursing supervisor, Christa Jarvis,[2]

disagreed about the way in which timekeepers should input time.  They had a meeting, and

Plaintiff considered the issue to be resolved.  But during that episode, the Clarksburg VA's

[2] The relevant representatives of the Defendant VA include:

Dr. Glenn Snider, Medical Center Director;
Terry Massey, Assistant Director;
Paul Carter, Associate Director for Patient Care Services;
Christa Jarvis, Associate Chief Nurse for Patient Care Services;
Lisa McManamay, Equal Employment Opportunity Officer; and
David Martino, Compliance Officer.

management learned that Plaintiff was not going to accede to their every wish.  Other issues later

in 2018 further signaled to the Clarksburg VA that Plaintiff would not kowtow to its

unreasonable demands.

> In late *August 2018*, Defendants' agents ordered Plaintiff to amend the existing SOPs regarding the security and storage of high risk medications and type up new SOPs relating to the storage and administration of insulin and hypoglycemia/hyperglycemia.

13.     In addition to keeping the employees' time, part of Plaintiff's duties in the Patient

Care department included updating and maintaining current editions of the SOPs and Medical

Center Memoranda (MCM's) for the Clarksburg VA.

14.     In late July and August of 2018, the Clarksburg VA amended and implemented

various policies regarding insulin, the security and storage of insulin, the administration of

insulin, and hypoglycemia/hyperglycemia.  *See* SOP 118-157 ("Hypoglycemia and

Hyperglycemia Parameters and Process to Notify Providers"), SOP 118-159 ("Administration of

Medications and Intravenous Fluids by Nursing Personnel"), SOP 118-120, SOP 118-125, SOP

118-52, SOP 118-025 ("Management of High Risk Medications"), and MCM No. 119-27 ("High

Risk Medication").  As the keeper of the SOPs, Plaintiff was charged with manually inputting

such changes given to him by upper management.  Christa Jarvis specifically told Plaintiff these

SOPs were a "priority," but at that time, Plaintiff did not understand why it was so important.

On one occasion, Jarvis and Paul Carter pressed Plaintiff why it was taking so long to add one

word, "insulin", to an SOP, but Plaintiff explained the entire document had to be re-typed and

re-formatted properly.  These changes to the SOPs were signed off on by upper management at

the Clarksburg VA between August 2, 2018 and August 30, 2018.

15.     Plaintiff's knowledge and maintenance of the SOPs meant he was the only employee outside of upper management at the Clarksburg VA, who knew about these critical, after-the-fact changes to existing insulin/hypoglycemia policies and the development of new insulin/hypoglycemia policies.

16.     These changes were made in August 2018 as part of an attempt to address issues central to the Clarksburg VA's failures in the serial killer episode.

17.     The critical nature of the changes to these SOPs was underscored in the Clarksburg VA's subsequent efforts in the summer of 2020.  In June of 2020, upper management at the Clarksburg VA switched gears and updated SOP 118-157 and removed the "Recission" category from the SOP, which would have shown that the policy was first issued in August 2018. The Clarksburg VA's June 2020 version of SOP 118-157 attempts to give the impression that the SOP was new and issued for the first time in June 2020 when, in fact, it was issued for the first time in August 2018.

Beginning in *late August 2018*, Defendants' agents at Clarksburg embarked on a path to create a hostile work environment for Plaintiff.

18.     During his employment by the VA, Defendants' agents knew Plaintiff suffered from PTSD.

19.     On August 28, 2018, a false allegation of sexual harassment was concocted and made against Plaintiff, and Plaintiff vehemently professed his innocence.  Upon Plaintiff's insistence, the matter was referred to an EEO manager at the Beckley VA for investigation, who acknowledged to Plaintiff that he was "'restricted by upper management'" at the Clarksburg VA and not given access to all of the documents.  The matter was ultimately dropped and closed by

Plaintiff's supervisors because it did not happen and presumably Defendants' agents realized it would be proven to be bogus, if pursued further. (2-10-20 FAD at p. 12).

20.     In hindsight, it is now clear that Plaintiff's knowledge of the change in SOPs related to insulin/hypoglycemia and his refusal to kowtow to upper management caused the Clarksburg VA's administrators to view him with serious concern, given the sensitive nature of that information and the desire of the Clarksburg VA's management to keep the unfavorable and horrific episode of the serial killer and the murdered veterans shielded from public view and scrutiny.

21.     On September 13, 2018, Plaintiff's supervisor, Paul Carter, informed Plaintiff he was imposing a 7-day suspension for Plaintiff being 15 minutes late to work on one occasion in August of 2018.  Plaintiff offered to use his accrued leave for the 15 minutes, but Carter refused to accept Plaintiff's offer.

> In *mid-September 2018*, Plaintiff told Defendants' agents he planned to and then did, in fact, blow the whistle on the Clarksburg VA's wrongdoing and unconscionable and dangerous conduct.

22.     Previously, at the end of August/beginning of September of 2018, Plaintiff learned about the serial killer and the Inspector General's June 2018 investigation into the matter.[3]

---

[3] The details of the serial killer's unconscionable and horrific murders were detailed in the Information filed in this Court in the case styled, *USA v. Reta Mays*, Criminal No. 1:20-cr-27 (July 13, 2020).  As detailed in the Information:

> "18.     In or about June 2018, a medical doctor employed by VAMC Clarksburg as a hospitalist reported to the hospitalist's supervisor a concern about the deaths of patients who had suffered unexplained hypoglycemic episodes on Ward 3A, including the deaths of multiple non-diabetic patients.  This concern led to an internal investigation that culminated in a referral for a criminal investigation.

23.     Medical Director Snider imposed a gag order for certain employees at the Louis

A. Johnson facility and ordered these employees not to discuss the serial killer or the killings of

the veterans there.  (*See, e.g.,*

https://www.usatoday.com/story/news/investigations/2019/10/15/clarksburg-va-deaths-hospital-o

versights-lapses-limit-homicide-evidence/3922640002/).

24.     During the meeting between upper management and Plaintiff regarding the

contrived suspension on September 13, 2018, Plaintiff indicated to Carter (and a union

representative) that he could no longer stay silent about the profoundly troubling issues facing

the Clarksburg VA and that he would be contacting President Trump, the Defendant and

Secretary Wilkie of the VA, veterans' advocates, and various media outlets to let them know

about the Clarksburg VA leadership's failures, mismanagement and dangerous acts.  In

particular, Plaintiff highlighted (a) **Defendants' continued employment of the serial killer,**

**which was then putting the VA's patients and employees continually at risk and in**

**substantial danger.**  Additionally, Plaintiff  noted, *inter alia*, (b) Defendants' refusal to timely

and adequately notify the murdered veterans' families of the reason for their passing as well as

the concealment of the serial killer controversy from the public at large; (c) Defendants' creation

of a fictitious ER sub-department in an attempt to get bonus money under false pretenses; (d)

Defendants' knowing breach of a countless number of veterans' HIPAA rights and

corresponding decision to under-report these violations; and (e) Defendants' indifference to the

---

19.     In or about July 2018, VAMC Clarksburg removed the defendant from a
position of patient care."

(*Id.* 18-19).  The Information sets forth that Reta Mays murdered veterans Robert Edge, Sr.,
Robert Kozul, Archie Edgell, George Shaw, W.A.H., Felix McDermott, Raymond Golden, and
R.R.P. between July 20, 2017 and June 18, 2018.  (*See generally id.*).

suicide of multiple veterans at the Clarksburg facility.  (12-1-19 Mem. at p. 6-7).  The following

sub-paragraphs explain these issues in more detail:

a.    *Continued on-site employment of the serial killer.*  While law enforcement

and federal prosecutors needed time to gather information to criminally

prosecute Reta Mays, Defendants knew in June-July 2018 that Mays was

the serial killer and did not have to prove it beyond a reasonable doubt in a

court of law in order to terminate her employment or, at the very least,

suspend her pending an investigation.  Not only did Defendants let Mays

continue to receive a salary, she continued to physically work in the

Clarksburg VA mail room until late April 2019 -- more than nine months

after she was known (by the VA's own admission) to be a serial killer in

July 2018![4]  As Plaintiff relayed in the meeting on September 13, 2018,

the allowance of the serial killer, Mays, to continue working in the

Clarksburg VA mail room was incredibly dangerous to VA patients and

employees.  (*Id.*).  At that point in time, there was certainly no telling what

she could do when it was readily apparent she had already murdered

several VA patients.  (*Id.*).

b.    *Failure to disclose the serial killer's murderous spree.*  At least some of

the victims' families were not told immediately that their loved ones were

---

[4] According to a *USA Today* article, Michael Missal, inspector general for the Department of
Veteran Affairs, "said investigators identified Mays as a person of interest shortly after officials
were notified of the suspicious deaths in 2018."
(https://www.usatoday.com/story/news/politics/2020/07/14/veteran-deaths-reta-mays-facing-mur
der-charges-clarksburg-deaths/5433526002/).#  The federal Information indicated that by July
2018 Mays had been moved out of patient care. (*See supra* n. 3).

murdered by the serial killer employed by the VA. (*See, e.g.*,

https://www.npr.org/2020/07/14/890776010/former-va-medical-worker-ch
arged-with-7-murders-in-west-virginia) (noting victim's daughter did not

find out her father was murdered until late August 2018 when the FBI

visited her residence);

https://www.washingtonpost.com/politics/suspicious-insulin-injections-ne
arly-a-dozen-deaths-inside-an-unfolding-investigation-at-a-va-hospital-in-
west-virginia/2019/10/05/89636e90-dee0-11e9-be96-6adb81821e90_story
.html (same).  Later, in a memorandum to internal investigators, Plaintiff

explained in September 2018 that: "[m]y main priority in doing this was

the murdered Veterans and their families['] right to know."[5]  (12-1-19

Mem. at p. 2).  Further, Defendants shielded information regarding the

serial killer and the murdered veterans from the public at large.

c.      *Use of a Fictitious ER Department.*  Switching gears, with respect to the

fictitious ER department issue, a letter from the U.S. Office of Special

Counsel to President Trump on September 29, 2017 stated as follows:

> The agency largely substantiated the
> whistleblower's[6] allegations.  The investigation revealed
> that over the last seven years, a Primary Care manager
> attempted to inappropriately influence ED nursing staff to
> place emergency patients in two unofficial clinics used to
> improperly reduce reported ED wait times and the number
> of ED patient encounters.  Affected patients were also
> improperly coded for medical billing purposes.  The

---

[5] At that time in September 2018, Plaintiff knew only that there were victims of the serial killer,
but he did not know the precise identity of these victims and assumed the families had no idea
about what had happened to their loved ones.

[6] To be clear, the whistleblower referred to in this quote is not the Plaintiff.

decision to create these unofficial clinics violated several VA Directives and prevented an accurate analysis of ED staff workload.  It also gave the false impression that the Primary Care clinic had a greater workload and demand for services. . . .

Based on this information, OSC requested that the VA address whether any effort to review improper medical copayment billing was conducted and provide an update on any administrative action recommended for the Primary Care manager.  The VA informed OSC that 602 veterans were charged an incorrect copayment, resulting in a total lost revenue of $21,070 for the clinic. The agency is currently determining how to recoup lost payments.  In addition, the Primary Care manager responsible for the creation of these improper clinics received a written counseling for her inappropriate conduct.

In comments to the report, the whistleblower praised ED staff who resisted these instructions and called attention to large bonuses received by managers responsible for the misconduct.  <u>The whistleblower faulted Johnson VAMC senior leadership and called for the removal of responsible individuals from service</u>.

(9-29-17 Ltr. from Leavitt to The White House)(emphasis added). While this issue was obviously known within the higher workings of the federal government, it had not received any media attention at the time when Plaintiff was engaging in his statutorily-protected whistleblowing activity.

d.      *Under-reporting of HIPAA Violations*.  Clarksburg VA's upper management was notified that thousands of veterans had their medical records compromised by an employee at the Clarksburg VA.  The media and the Secretary of the U.S. Department of Health and Human Resources is required to be notified when more than 500 individuals are involved in the breach.  45 CFR §§ 164.406-408.  Yet, the Clarksburg VA's upper management instructed the Privacy Officer to report only 200 HIPAA violations, which because of the

smaller, incorrect number meant that the media and the Secretary of DHHS were not contacted, as the VA would been required to do, had the correct number of violations been reported.  (Bee-Delgado Answers at Item 9, pp. 13-14; *see also* 45 CFR §§ 164.400-414).  That is, the actual number of violations was in the thousands and was purposefully under-reported to avoid these requirements.  (*Id.*).

e.      *Indifference to Veterans' Suicides.*  Plaintiff noted the following two incidents, in particular:

> A Veteran called into the facility and asked for help. He stated he was coming to the facility and going to kill himself.  Proper protocol and procedures were not followed and the Veteran sat in the parking lot while VA officers walked by him, upwards of (3) different times.  The Veteran shot and killed himself in our parking lot.  This event was covered up and didn't make the National news.
>
> * * * *
>
> . . . Summer of 2017, a Veteran was admitted on 4B (psychiatric ward lock-down) due to his wife committing suicide.  He was discharged.  Protocol and procedures state that a follow-up / check-up phone call will be made for 3 consecutive days following discharge.  This was not done until the 3rd day.  A health and welfare check was initiated on day 3 after discharge only to find that the patient had already committed suicide.

(2-11-19 Ltr. from Bee to McKinley).

25.      In an email to Lisa McManamay after the meeting in the afternoon on September 13, 2018, Plaintiff stated that he planned to contact news agencies "to report the shadiness and cover-up scandals here at the VA."  (9-13-18 Email from Bee to McManamay).

26.     In an email to the VA's Equal Employment Officer, Lisa McManamay, and

Plaintiff's immediate boss, Paul Carter, on September 14, 2018, Plaintiff reiterated that

"Veterans Advocates" need to hear what is transpiring at the Clarksburg VA and referred to the

conversation the day before and specifically highlighted the aforementioned problems and issues

set forth in paragraph 24 above.  *See supra.*  (9-14-18 Email).  Plaintiff's email stated, in relevant

part, "not only is the [serial killer] employee not in jail, but remains employed and on straight

day shifts . . . [another employee] created a fictitious department with fictitious veterans seeking

and receiving healthcare that resulted in her receiving bonus money paid for her outstanding

performance.  Lets [*sic*] also not forget that she has multiple HIPPA [*sic*] violations and

complaints[.]" (*Id.*).

27.     Shortly thereafter, in mid-September of 2018, Plaintiff contacted David Martino,

Compliance Officer, and again talked about exposing upper management's gross

mis-management and bringing media attention to shine a light on the intolerable and unsafe

situation at the Clarksburg VA, and Plaintiff forwarded Martino some emails.  After reviewing

the emails, Martino met with Plaintiff in his office and told him bluntly, "work things out with

Carter or everyone will go down." (*See* 12-1-19 Mem. to Delgado).

28.     After he did not get a satisfactory response to the concerns he voiced to the

Clarksburg VA's upper management in September 2018 (and it became clear that internal

procedures at the VA were not going to be fruitful or productive), Plaintiff carried out what he

told the Clarksburg VA's upper management he was going to do and began contacting entities

outside of the Clarksburg VA.  That is, Plaintiff reached out to the VA's Office of Inspector

General ("OIG") hotline, to Congressman McKinley's Office, and to various news outlets from

October-December 2018 and detailed the issues he previously laid out to McManamay, Carter and others.  (2-14-20 EEO App. ¶ 5).

Following Plaintiff's attempts in *October - December 2018* to draw attention to these matters, the tension in the work atmosphere escalated, and the situation spiraled out of control.

29.     In late October 2018, Plaintiff  contacted a local television station about the serial killer and the failure of the VA to notify the families of those veterans that were murdered there.

30.     On October 24, 2018, Plaintiff contacted the Office of Inspector General.

31.     Needless to say, the Clarksburg VA's upper management and Defendants' agents did not take kindly to the publication of these facts to various media outlets and high-ranking public officials by Plaintiff.

32.     The tension in the work atmosphere escalated.

Plaintiff requested a transfer because of his PTSD and the stressful work environment, and the Clarksburg VA formally denied the request for accommodation in *November 2018*.

33.     In an email to upper management as early as September 13, 2018, Plaintiff indicated he no longer felt comfortable working at the Clarksburg VA and requested a transfer. (9-13-18 Bee email to McManamay).

34.     On September 24, 2018, Plaintiff again informally requested a reasonable accommodation to telework and/or a reassignment because he felt "anxiety, was scared to come to work, felt like he did not have support service, and that he was being set up to be fired." (2-10-20 FAD at p. 10).

35.     On October 26, 2018, Plaintiff's doctor submitted a form to the Clarksburg VA citing Plaintiff's PTSD and requesting that Plaintiff either be permitted to telework or be

transferred out of the Patient Care Department due to the current work environment.  In this form, the doctor noted that Plaintiff did his "job well and wants to keep working."

36.      On November 13, 2018, Clarksburg VA's upper management denied Plaintiff's request for an accommodation based upon his disability.

In *late 2018-early 2019,* Plaintiff continued to sound the alarm to the public about the Clarksburg VA, and the work atmosphere continued to deteriorate even further.

37.      The work atmosphere grew exceedingly tense, and during the latter part of 2018 Plaintiff used much of the leave he had accrued throughout his career at the VA.

38.      In January-February of 2019, Plaintiff wrote to the Defendant Secretary of the VA, Robert Wilkie, President Trump and the White House, and others about the aforementioned issues involving the Clarksburg VA.

39.      On February 11, 2019, Plaintiff wrote a letter to Congressman McKinley that included the following statement:

> FBI and local police investigating up-to 12 murders within our facility by an employee that has not only remained on the payroll, but given a promotion and better hours.  This employee isn't performing patient care.  No national media coverage and the families of these 12 deceased Veterans, at least to my knowledge, have not been informed that any type of investigation is taking place. The way these Veterans were murdered, insulin.  Yes sir, I know the employees name . . . .

(2-11-19 Ltr. from Bee to Cong. McKinley).

40.      On February 21, 2019, Plaintiff, then *pro se*, filed his original formal Complaint with the OAWP and set forth the issues he had previously aired with upper management at the Clarksburg VA (as detailed above in paragraph 24) in the September 2018 meeting and emails.

(EEO Investigative Rpt. File at 713, 718-722).  Regarding the serial killer, Plaintiff's Complaint noted:

> Upwards of 12 Veterans have been murdered with insulin and an [*sic*] on-going FBI investigation since [*sic*] spring of last year has resulted in no arrests of the employee but with her removal from patient care and placed in a nice Mon-Fri 8 hour per day job [on site at the VA].  This employee is a threat to every person within the facility . . . .  [The serial killer's] actions are unable to be predicted and the speculation that  . . . [she] would just as easily and without care unleash gunfire within the facility rather than being arrested isn't a far stretch by any means.  A VA police officer that is armed should escort this employee at all times they are on the premises but this isn't happening at all. Everyone is at risk and it hasn't even made the national news, but it will.

(EEO Investigative Rpt. File at 719).  Plaintiff also again detailed the issues discussed above with respect to (b) the failure to disclose the serial killer's murder spree, (c) the use of a fictitious ER department,  (d) the under-reporting of HIPAA violations and (e) the indifference to veterans' suicides.

> ### Defendants' agents preyed on his PTSD and caused him so much stress that he had to seek medical attention related to his PTSD in *February 2019.*

41.     On February 4, 2019, Carter sent an email to the HR department recommending termination of Plaintiff and copied Plaintiff on this email.

42.     The VA's HR department refused to carry out the termination.

43.     As a result of the continued work atmosphere, Plaintiff was forced to seek medical treatment on February 4, 2019.

44.     On February 14, 2019, Plaintiff emailed a manager in the Beckley VA and stated:

> "I was being treated for the anxiety, depression and PTSD I have related to my almost 9 years working in support of Operation Enduring Freedom, Afghanistan prior to working here at the VA as an employee.  Since I started this position, my symptoms have worsened, I am on more medication, am in therapy, and last week was admitted to the inpatient unit for over 48 hours.  I cannot

tolerate the amount of anxiety, stress and harassment I am being
subjected to and it has been on-going and has become relentless."

(EEO Investigative Rpt. File at 73).

45.     On February 28, 2019, Carter tossed some papers at Plaintiff, and admittedly,
Plaintiff did not take kindly to this act.

46.     As the FAD noted, Plaintiff stated that "management was aware of his mental
health conditions and wanted him to react."  (2-10-20 FAD at p. 12).

47.     Similarly, the internal EEO Investigator noted that Plaintiff contended "his
disabilities were key in these events as leadership identified his stressors and then attacked him
in hopes of provoking him into an incident that would result in his termination." (EEO
Investigative Rpt. File at 125).

48.     On March 1, 2019, Carter sent another proposal for Plaintiff's termination to HR
for disrespecting a supervisor.

49.     On March 5, 2019, Plaintiff was notified by HR via email that the proposal for
termination was placed on hold because of protections for whistleblowers within the VA, as set
forth in 38 U.S.C. § 714(e).  (EEO Investigative Rpt. File at 302).

50.     In the "Management Response's" section of the agency's FAD, it was noted that
Plaintiff "states that his disability was a factor in S1 and other management official's decision to
suspend him, because they identified his stressors and then subsequently triggered him with the
intention of getting him into more trouble.  Complainant asserts that prior to the proposed and
final suspension, he had never received any form of discipline verbally or in writing."  (2-10-20
FAD at  p. 6).

<u>Defendants re-assigned Plaintiff to the laundry room and have suspended him without pay since</u>
<u><i>April 2019.</i></u>

51.     On March 29, 2019, Defendant transferred and re-assigned Plaintiff to the laundry

facility.

52.     On April 1, 2019, the laundry room supervisor told Plaintiff that he was advised

by Carter to "confine" Plaintiff to the laundry room. (*See* 2-10-20 FAD at p. 12).  **Meanwhile, at**

**this time, the serial killer continued working in the mail room, and she was not confined**

**there.**  Bizarrely, Reta Mays was ultimately fired in late April 2019 for lying on her resume, not

the murders.  (*See*

https://www.wpxi.com/news/investigates/veterans-affairs-deaths-a-serial-killer-at-the-va-hospital

-what-s-behind-a-series-of-deaths/1012567899/;

https://www.washingtonpost.com/politics/suspicious-insulin-injections-nearly-a-dozen-deaths-in

side-an-unfolding-investigation-at-a-va-hospital-in-west-virginia/2019/10/05/89636e90-dee0-11e

9-be96-6adb81821e90_story.html);

https://www.washingtonpost.com/politics/suspicious-insulin-injections-nearly-a-dozen-deaths-in

side-an-unfolding-investigation-at-a-va-hospital-in-west-virginia/2019/10/05/89636e90-dee0-11e

9-be96-6adb81821e90_story.html).

53.     After Plaintiff objected to this transfer, according to the agency's FAD, the

Clarksburg VA placed him on administrative leave without pay on April 5, 2019, and he remains

on such leave.  (*See* 4-8-20 VA App. Resp. to OEDCA FAD at 9, n. 15).

54.     In the "Management Response's" section of the agency's FAD, it was noted that

Plaintiff "believes that he was reassigned to the laundry facility in retaliation for filing a

whistleblowing claim and asserts that the reassignment violated the limitations associated with

his disabilities.[footnote omitted].  Complainant [Plaintiff] attests S1 [] decided to reassign him because he hoped Complainant would quit."  (2-10-20 FAD at 7).

55.     On June 3, 2019, Plaintiff's position as "Program Support Assistant" was being filled under an internal vacancy announcement.

56.     No matter how Defendants describe his status, Plaintiff has received a *de facto* termination inasmuch as he has not been paid since April 2019.

57.     The VA's internal investigation sided with management.  In his *pro se* appeal of the decision in February 2020, Plaintiff highlighted "the worst and ugliest part of the Veterans Administration and that's the corrupt cover-ups, lies, manipulations, and continued lack of support given to the actual victims but [instead] supporting the officials responsible thus allowing the corrupt actions to continue." (2-14-20 EEO App.).

Between *September 2018 and August 2019*, Defendants' agents retaliated against Plaintiff for his whistleblowing activity and in an effort to suppress unfavorable information from surfacing in the public domain.

58.     Plaintiff stated "the reprisal from leadership started on September 13 and 14, 2018 when I indicated that I was going to inform Veteran advocates of the activities that are routine at the Clarksburg Louis A. Johnson VA Medical Center (LAJVAMC)."  (2-27-20 Letter from Bee, re: Resp. to Carter's Aff't & Q's in Supp. of OAWP Referral, at Item #2, p. 2).

59.     As Plaintiff's statement to the EEOC made clear: Defendants' agent "would NOT stop, especially after I [Plaintiff] indicated that I would start with President Trump and Secretary Wilkie and NOT stop contacting and informing everybody that would listen about the cover-ups

and abuse of power that has occurred at the LAJVAMC."  (2-27-20 Letter from Bee, re: Resp. to

Carter's Aff't & Q's in Supp. of OAWP Referral, at Item 4, p. 4).

60.     Tragically, the Clarksburg VA's upper management appears to have been more

concerned with protecting their reputation from the threat of public exposure of this horrific

serial killer episode posed, in part, by Plaintiff's whistleblowing, than they were with protecting

their employees and patients and making amends for the catastrophic murders of the veterans in

their facility.

 Despite Plaintiff's efforts, the Clarksburg VA was able to conceal the serial killer episode from
public view from *June 2018 - August 2019.*

61.     The VA acknowledged it knew about the murders in June 2018.

62.     In late August of 2019, the estate of one of the murdered veterans, Felix K.

McDermott, provided a Notice of Claim to the VA.

63.     The allegations of the McDermott Estate were reported in the *Clarksburg*

*Exponent Telegram* shortly thereafter.

64.     It was only then that the Clarksburg VA announced on August 27, 2019, that it

was investigating 11 suspicious deaths at the VA.

(https://www.washingtonpost.com/politics/2019/08/30/officials-are-investigating-suspicious-deat

hs-va-hospital-two-have-been-ruled-homicides/).

65.     These events in late August 2019 prompted widespread news coverage of the

serial killer and murders.

66.     Prior to this time period, the VA was largely successful in keeping the scandal

hidden from public view.

<u>When the details finally came to light in *late 2019*, the truth prompted widespread condemnation, including from Senators Manchin and Capito.</u>

67.    The *Washington Post* reported:

"'All of us are up in arms,' said Sen. Joe Manchin III (D-W.Va.), describing the reaction of his colleagues on the Senate committee that oversees veterans' care. He said he is incredulous that hospital leaders in Clarksburg took so long to put the pieces together.
'You mean to tell me that for nine months you didn't know what was going on in your hospital?' Manchin said. 'Either you didn't care, or there was a lack of competency.'
'You can't be this removed' from hospital operations, Manchin said. 'It's almost like you don't give a darn.'
The senator said he is preparing to call for a 'full-blown' Senate investigation into how VA handled the case."

([https://www.washingtonpost.com/politics/suspicious-insulin-injections-nearly-a-dozen-deaths-inside-an-unfolding-investigation-at-a-va-hospital-in-west-virginia/2019/10/05/89636e90-dee0-11e9-be96-6adb81821e90_story.html](https://www.washingtonpost.com/politics/suspicious-insulin-injections-nearly-a-dozen-deaths-inside-an-unfolding-investigation-at-a-va-hospital-in-west-virginia/2019/10/05/89636e90-dee0-11e9-be96-6adb81821e90_story.html)).

68.    Senator Capito also noted the "news is sickening and troubling" and that she would do "everything I can to make sure this is fully investigated."

(https://www.wwnytv.com/2019/08/25/death-veteran-wv-va-hospital-ruled-homicide/).

69.    In his daily column for *WV Metronews* on August 30, 2019, Hoppy Kercheval likewise stated:

. . . Through reporting and the cooperation of victims' families, we now have confirmation that two veterans who died at the hospital were murdered, put to death by someone who injected them with lethal doses of insulin. Neither was diabetic.

The *Clarksburg Exponent* newspaper was the first to report on the homicide of retired Army Sergeant Felix McDermott. That was followed by a *USA Today* report of Air Force veteran George Shaw, Sr.'s death. Military autopsy reports show the deaths of both men in April 2018 were homicides.

Those deaths are shocking enough, but investigators have told family members that the deaths of ten patients at the hospital are suspicious.

The hospital and the Veterans Administration's response has been to stonewall.  A hospital spokesman issued a brief statement which stood out for its defensive tone.

‘Allegations of potential misconduct you may have heard about in media reports do not involve any current Louis A. Johnson VA Medical Center employees.  Immediately upon discovering these serious allegations, Louis A. Johnson VA Medical Center leadership brought them to the attention of VA's inspector general while putting safeguards in place to ensure the safety of each and every one of our patients' said spokesman Wesley Walls.

The statement went on to refer additional questions to the Office of the Inspector General within the Veterans Administration.  That office answers press inquiries with the standard defense that it cannot talk about an ongoing investigation.

There are a couple of fundamental problems here.

First, confidence in the hospital has been shaken to the core by these revelations and the best the facility can do to reassure former, current and future patients and their families is to say that no current employee is involved.

Well, who was involved?  What action, if any, was taken against that person?  What are the new safeguards?  Do ‘new safeguards' mean that previously the checks and balances were so lax that someone could murder patients?

Second, why has the investigation taken so long?  These suspicious deaths have been known about for well over a year.  The autopsy report for McDermott was completed last February.

This country demands much from its soldiers, including the possibility that he or she will have to make the ultimate sacrifice.  In return, the country honors them and pledges to care for them.  For at least two veterans, and possibly as many as ten, that sacred promise has been violated.

(https://wvmetronews.com/2019/08/30/va-stonewalling-on-murders-suspicious-deaths-at-clarksburg-hospital/).

<u>Plaintiff seeks reinstatement to his job.</u>

70.     Plaintiff has not secured employment elsewhere, and the stress of the

aforementioned events coupled with his pre-existing PTSD candidly make it difficult for him to

find and hold a job at this juncture.

71.     Plaintiff nevertheless seeks reinstatement to his position at the VA, should

appropriate action be taken by Defendants and the right circumstances be present.  That is, all

Plaintiff has ever wanted was to be allowed to do his job in a reasonable atmosphere free from

harassment.

**Claims**:

**(COUNT I - WRONGFUL UNPAID SUSPENSION & *DE FACTO* DISCHARGE IN VIOLATION OF THE WHISTLEBLOWER PROTECTION ACT, THE REHAB ACT, AND THE WEST VIRGINIA HUMAN RIGHTS ACT)**

72.     The previous allegations of this Complaint are incorporated by reference herein.

73.     Defendants and their agents cannot give a legitimate, non-discriminatory reason

for the adverse employment actions taken against Plaintiff.

74.     The Rehab Act, 29 U.S.C. § 705, *et seq.*, and West Virginia Human Rights Act,

W. Va. Code § 5-11-1, *et seq.*, ban discrimination based upon disability.  Sections 794 and 795

of the Rehab Act incorporate the anti-discrimination remedies and procedures set forth in Section

717 of Title VII.  Hence, the Title VII remedies apply to federal disability discrimination claims.

75.     The federal Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8), provides that an

agency shall not take a personnel action against (*i.e.*, suspend without pay or fire) an employee

because of any disclosure of information by an employee which the employee reasonably

believes evidences any violation of any law, rule or regulation <u>or</u> evidences gross

mismanagement, a gross waste of funds, an abuse of authority or a substantial and specific danger to public health or safety.

76.     Defendants' adverse employment actions taken against Plaintiff were based upon his disability and his statutorily-protected whistleblowing activity in violation of the aforementioned Acts.

77.     As the FAD noted, Plaintiff "asserts that the proposed removal [was] too harsh, and motivated by animus towards his protected bases, because management wore him down and intentionally caused his mental health problems to worsen in hopes that he would react negatively, which he finally did." (2-10-20 FAD at p. 14).

78.     Plaintiff suffered damages as a consequence, as articulated more fully in the final section.

79.     Defendant's adverse employment actions taken against Plaintiff were malicious.

**(COUNT II - FAILURE TO REASONABLY ACCOMMODATE DISABILITY IN VIOLATION OF WEST VIRGINIA AND FEDERAL LAW)**

80.     The previous allegations of this Complaint are incorporated by reference herein.

81.     Plaintiff is a "qualified individual with a disability," as that phrase is defined in the West Virginia Human Rights Act and under W.Va. CSR §77-1-4.2 and under federal law.

82.     Under the West Virginia Human Rights Act, W.Va. Code §§5-11-1 through -19, and the attendant regulations, W.Va. CSR §77-1-4.5 and federal law , Defendants were also obligated to make reasonable accommodations for Plaintiff's disability to enable him to remain working for Defendants.

83.     Under these facts, Defendants should have reasonably accommodated Plaintiff by permitting him to transfer to another department or to telework.

84.     Plaintiff's reasonable accommodation request was wrongfully and illegally denied.

### (COUNT III - FAILURE TO RE-HIRE)

85.     Plaintiff re-alleges and incorporates by reference the previous allegations stated herein.

86.     After wrongfully terminating Plaintiff, Defendants has since hired an employee for Plaintiff's previous job.

87.     Plaintiff was not re-hired by Defendants because of his disability in violation of West Virginia Human Rights Act, W.Va. Code  §§ 5-11-1 through -19 and federal anti-discrimination law (described above) and because of his statutorily-protected whistleblowing activity in violation of 5 U.S.C. § 2302(b)(8).

88.     Defendants' failure to re-hire Plaintiff also caused him damages.


WHEREFORE, Plaintiff prays for judgment against Defendant to fully compensate him for the harms and losses he has suffered and continues to suffer, including the following:

a.     Plaintiff be reinstated to employment after appropriate action has been taken at the Clarksburg VA;

b.     Plaintiff be awarded back pay wages, front pay wages and fringe benefits due and owing with pre-judgment and post-judgment interest thereon;

c.     Plaintiff be awarded a sum of money representing diminished earning capacity in an amount to be determined at trial;

d.      Plaintiff be awarded compensatory damages in an amount to be determined at trial for the severe emotional distress, humiliation, anxiety, embarrassment, aggravation, annoyance, inconvenience, and loss of enjoyment of life suffered by Plaintiff as a result of Defendant's unlawful acts;

e.      Plaintiff be awarded any and all additional economic losses suffered by Plaintiff as a result of Defendant's unlawful acts;

f.      Plaintiff be awarded costs of litigation and all reasonable attorney's fees;

g.      Plaintiff be awarded pre-judgment and post-judgment interest on any damages awarded at the trial of this matter; and

h.      Plaintiff be awarded such further relief as this Court deems appropriate.

PLAINTIFF DEMANDS A TRIAL BY JURY.


                                                    Plaintiff, **GREGORY W. BEE**,
                                                    --By Counsel--


/s/ Robert M. Bastress III

_____
Robert M. Bastress III          (WVSB#9616)
**DiPIERO SIMMONS McGINLEY & BASTRESS, PLLC**
604 Virginia St., E.
Charleston, WV 25301
304-342-0133
rob.bastress@dbdlawfirm.com
*Counsel for Plaintiff*